1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

| | |
|---|---|
| NATIONAL FLOOD SERVICES, INC., a Delaware corporation, and FISERV, INC., a Wisconsin corporation,<br><br>            Plaintiffs,<br><br>v.<br><br>TORRENT TECHNOLOGIES, INC., a Delaware corporation, TRAVIS PINE and SUSANNA PINE, and their marital community; THERESA N. JOHNSTON and RALPH JOHNSTON, and their marital community,<br><br>            Defendants. | No.  C05-1350Z<br><br>ORDER |

18

19

20

21

22

23

24

25

26

## I.    INTRODUCTION

       This matter comes before the Court on Plaintiffs' Motion to Dismiss Counterclaims I-IV, docket no. 14.  The Court has considered the briefs in support of and in opposition to the motion, and heard oral argument on May 5, 2006.  At the conclusion of oral argument, the Court GRANTED Plaintiffs' Motion to Dismiss Counterclaims I-IV, docket no. 14.  This Order explains the basis for the Court's decision.

ORDER   1–

## II.   BACKGROUND

### A.   Present Action and Present Motion

National Flood Services, Inc. ("NFS") and Fiserv, Inc. ("Fiserv") bring this lawsuit against two of NFS's former employees, Travis Pine ("Pine") and Theresa N. Johnston ("Johnston"), and against Torrent Technologies, Inc. ("Torrent"), alleging, in part, that Pine and Johnston breached employment contracts when they left NFS to form Torrent.  Am. Compl., docket no. 7, ¶¶ 103-112.  Defendants Pine and Torrent set forth eleven counterclaims in Defendants' Answer to Plaintiffs' Amended Complaint.  Answer, Affirmative Defenses, Counterclaims, and Jury Demand, docket no. 9, at 16-32.[1]  Plaintiffs moved to dismiss Counterclaims I-IV, which allege: (I) restraint of trade in violation of Section 1 of the Sherman Act; (II) monopolization in violation of Section 2 of the Sherman Act; (III) attempt to monopolize in violation of Section 2 of the Sherman Act; and (IV) violation of state antitrust, monopolization, unfair competition, and restraint of trade laws.  Counterclaims, docket no. 9, ¶¶ 36-56.

### B.   Factual Background[2]

#### 1.   Flood Vendors

---

[1] The portion of the Answer containing the Counterclaims is referred to hereinafter as "Counterclaims."

[2] For the purposes of Plaintiffs' motion to dismiss, the Court has accepted all factual allegations plead in Defendants' Counterclaims as true.  In addition to facts alleged in the Counterclaims, the Court has considered Defendants' Answer, which Defendants expressly incorporated into their Counterclaims, see Counterclaims at 16, together with the employment contracts attached as Exhibits A-H to Plaintiffs' Amended Complaint, docket no. 7, and the "Executive Summary" attached as Exhibit N to Plaintiffs' Amended Complaint.  The Court DENIES Defendants' Motion to Strike, docket no. 18, at 23, because the Court does not strike arguments made in a party's briefing.  Nonetheless, the Court makes clear that, for the purposes of this motion, the Court does not take Plaintiffs' allegations in Plaintiffs' Amended Complaint, docket no. 7, as true.  The parties dispute whether Plaintiffs' motion to dismiss relies on facts outside of the pleadings and whether the motion must be converted to one for summary judgment.  The Court declines to convert the motion to a summary judgment motion.

ORDER   2–

1   This case involves businesses that operate in the flood insurance market.  Specifically,

2   Fiserv/NFS[3] is a flood vendor.  Id. ¶¶ 7, 44.  A "flood vendor" is a third-party administrator

3   who provides policy and claims servicing to private insurance companies – called Write

4   Your Own ("WYO") insurance companies – that sell flood insurance under the federal

5   National Flood Insurance Program ("NFIP").  Id. ¶¶ 5-6.  Approximately 89% of WYO

6   insurance companies use a flood vendor.  Id. ¶ 6.  Policy and claims servicing includes

7   processing insurance applications, collecting initial premiums, issuing policies, providing

8   lender notification, providing ongoing premium billing and collection, providing customer

9   support to both agents and insureds, maintaining policy and claims records, processing and

10  paying claims, and reporting statistical data to the Federal Emergency Management Agency

11  ("FEMA").  Id. ¶ 6.  Flood vendor services are specialized because of the specific

12  requirements of flood insurance as established by FEMA.  Id. ¶ 10.  The highly-regulated

13  nature of the flood insurance industry creates barriers to entry into the market.  Id. ¶ 12.

14  Torrent is a start-up company that is attempting to enter the flood vendor market to provide

15  flood insurance servicing in competition with Fiserv/NFS.  Id. ¶ 8.

16              **2.     Plaintiffs' Anticompetitive Strategy**

17      In support of Counterclaims I-IV, Defendants allege that Fiserv/NFS is engaged in a

18  series of anticompetitive strategies to monopolize and restrain competition in the flood

19  vendor market and to eliminate Torrent as a competitor.  See, e.g., id. ¶¶ 17-19, 27-29, 46.

20  These strategies include: (a) acquiring competitors, id. ¶ 17; (b) usurping Torrent's

21  intellectual property, id. ¶¶ 19-26, 34, 38-39; (c) filing repetitive and baseless claims against

22  Torrent to drain its resources, id. ¶¶ 27, 35; (d) extracting unreasonable and unenforceable

23

24

25  _____

26  [3] NFS is a wholly-owned subsidiary of Fiserv.  Pls.' Answer to Counterclaims, docket no. 15, at 2 (admitting Counterclaims ¶ 2).  The Order refers to Plaintiffs as "Fiserv/NFS" to be consistent with the allegations in Defendants' Counterclaims.

ORDER  3–

contracts from employees to prevent competition, id. ¶¶ 18, 28-29, 37, 39; and (e) attempting to obtain Torrent's confidential and proprietary development materials. Id. ¶ 30.

### a.    Acquiring Competitors

The first component of Plaintiffs' alleged anticompetitive strategy is Plaintiffs' acquisition of competitors. Fiserv/NFS has purchased several of its primary competitors, namely National Con-Serv, Inc. ("NCSI") and Insurance Management Solutions Group, Inc. ("IMSG"). Id. ¶ 17. Through these and other acquisitions, Fiserv/NFS has succeeded in eliminating most of its competition in the flood vendor market. Id. Fiserv/NFS is the exclusive provider of flood vendor services to approximately 93% of WYO insurance companies who use outside administrative services. Id. ¶¶ 11-12.

### b.    Usurping Torrent's Intellectual Property

The second component of Plaintiffs' alleged anticompetitive strategy is Plaintiffs' attempt to usurp ownership of Torrent's intellectual property. In July 2005, Fiserv/NFS obtained a copyright registration for a document entitled "Executive Summary," which was written by Pine and which describes Torrent's business model and its planned technology. Id. ¶¶ 20-22. Fiserv/NFS obtained the registration by making fraudulent representations to the United States Copyright Office. Id. ¶¶ 22-23. Fiserv/NFS has never used the copyrighted work and its primary purpose in procuring the copyright was to create a basis for a copyright claim against Torrent in this lawsuit and to deny Defendants their lawful right to register the document. Id. ¶¶ 21, 24. Fiserv/NFS's attempted enforcement of the improperly-obtained copyright is part of its anticompetitive strategy to prevent Torrent, and others, from entering the flood vendor market. Id. ¶¶ 25-26, 38-39. Torrent has been damaged by Fiserv/NFS's illegitimate assertion of copyright in Torrent's Executive Summary. Id. ¶ 34.

ORDER  4–

### c.    Filing Repetitive and Baseless Claims Against Torrent

The third component of Plaintiffs' alleged anticompetitive strategy is Plaintiffs' filing of repetitive and baseless claims against Torrent in an effort to drain Torrent of economic resources.  In May 2005, Fiserv/NFS filed a complaint and a petition for a temporary restraining order ("TRO") in King County Superior Court.  Id. ¶ 27.  King County Superior Court denied the TRO.  Id.  In August 2005, Fiserv/NFS filed the present lawsuit in federal court, presenting claims that substantially overlap with the claims pending in state court.  Id. Fiserv/NFS's initiation of the present lawsuit is causing irreparable injury to Defendants and adversely affecting Defendants' ability to compete and to sell its products and services in the marketplace.  Id. ¶ 35.

### d.    Extracting Unreasonable and Unenforceable Contracts from Employees

The fourth component of Plaintiffs' alleged anticompetitive strategy is Plaintiffs' use of unreasonable and unenforceable employment contracts to prevent competition. Fiserv/NFS forces employees of the over one hundred companies owned by Fiserv to enter into contracts that restrict competition with any Fiserv company and restrict the use of confidential information.  Id. ¶¶ 18, 28.  These contracts constrain future competitors of Fiserv/NFS by preventing legitimate competition by any person who has ever worked for Fiserv/NFS.  Id. ¶¶ 18, 29.  These contracts are not ancillary to any legitimate business purpose or transaction and are not necessary to protect Fiserv/NFS's legitimate property interests.  Id. ¶ 29.

In particular, Pine and Johnston entered into two employment contracts with Fiserv/NFS: (1) the "Employee Confidential Information and Development Agreement" (referred to hereinafter as the "Confidentiality Agreement"), see Am. Compl., Exs. A-D,[4] and

---

[4] The Confidentiality Agreements signed by Pine on September 6, 2001, and on January 13, 2003, are attached to the Amended Complaint as Exhibits A and B, respectively.  The

ORDER  5–

(2) the "Employee Non-Qualified Stock Option Agreement" (referred to hereinafter as the "Option Agreement"), see Am. Compl., Exs. E-H.[5] Counterclaims ¶¶ 28, 37. At oral argument, Defendants clarified for the Court that these two agreements are the sole agreements at issue in Defendants' Counterclaims I-IV.[6]

The Confidentiality Agreement, in part, prohibits the disclosure of certain confidential information during and after the employee's employment, requires the return of certain Fiserv property upon the employee's termination of employment, assigns certain intellectual property rights created within the scope of employment to Fiserv, and prohibits the employee from engaging in any activity that creates a conflict of interest with Fiserv's interests. See, e.g., Am. Compl., Exs. A-D, ¶¶ 1, 4 and 10 (paraphrased). The Option Agreement, in part, grants the employee stock options on the condition that the employee restrict his or her interactions with clients, prospective clients, and employees of any Fiserv Group Company in certain ways for a period of twelve months after the termination of the employee's employment with Fiserv or any subsidiary of Fiserv. See, e.g., Am. Compl., Exs. E-H, ¶¶ 1, 4(d) (paraphrased).

### (e) Attempting to Obtain Torrent's Confidential and Proprietary Development Materials

Fiserv/NFS demanded that Torrent hand over to Fiserv/NFS all of Torrent's computers and proprietary development materials. Id. ¶ 30. Fiserv/NFS is pursuing efforts to develop technologies that would mimic Torrent's technologies. Id.

_____

Confidentiality Agreements signed by Johnston on December 5, 2001, and on January 16, 2003, are attached as Exhibits C and D, respectively.

[5] The Option Agreements signed by Pine on February 11, 2003, and on February 18, 2004, are attached to the Amended Complaint as Exhibits E and F, respectively. The Option Agreements signed by Johnston on February 11, 2003, and on February 18, 2004, are attached as Exhibits G and H, respectively.

[6] See also Defs.' Resp. at 9.

ORDER  6–

### 3.    Anticompetitive Injury

As a result of Fiserv/NFS's anticompetitive conduct, the consumers and potential consumers of Fiserv/NFS's flood vendor services: (a) are forced to use a weak and outdated product, and (b) pay higher prices for flood vendor services than they would in the absence of Fiserv/NFS's anticompetitive conduct.  Id. ¶ 13; see also ¶¶ 14-15 (alleging the antiquated nature of Fiserv/NFS's technology).  Defendants further allege that "Fiserv/NFS's anti-competitive conduct has and will continue to harm competition generally in the relevant market," id. ¶ 31; that "if Fiserv/NFS's conduct is permitted to continue, the flood insurance industry itself is at great risk" because "Fiserv/NFS's systems infrastructure is vulnerable due to its antiquated foundation, without adequate backup and disaster recovery measures in place," id. ¶ 32; that "Fiserv/NFS's unreasonable, illegitimate, predatory, and anti-competitive conduct has caused injury to competition in the relevant market and to Torrent," id. ¶ 33; that Fiserv/NFS's anticompetitive conduct has damaged Torrent and adversely affected its ability to compete, id. ¶¶ 34-35; that Fiserv/NFS's anticompetitive conduct "has and will continue to actually injure competition, beyond the impact on Torrent's business, and within the flood vendor market by preventing the entry into the market of Torrent and other actual or potential competitors of Fiserv/NFS," id. ¶ 40; that Fiserv/NFS's anticompetitive conduct "has caused injury to Torrent, as well as injury to competition in the relevant market," id. ¶¶ 42, 47, 52 and 56; and that Fiserv/NFS's anticompetitive conduct is an attempt "to destroy a nascent company so as to prevent and eliminate competition in the flood vendor market," id. ¶ 49.

## III.    DISCUSSION

### A.    Motion to Dismiss Standard Under FED. R. CIV. P. 12(b)(6)

Plaintiffs move under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Defendants' antitrust counterclaims for failure to state a claim upon which relief may be granted.  "A complaint should not be dismissed for failure to state a claim unless it appears

ORDER  7–

1  beyond doubt that the [claimant] can prove no set of facts in support of his claim which

2  would entitle him to relief." Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 746

3  (1976).  The Court accepts all factual allegations plead in Defendants' Counterclaims as true,

4  and resolves any doubts in favor of the pleader.  See Everest and Jennings, Inc. v. Am.

5  Motorists Ins. Co., 23 F.3d 226, 228 (9th Cir. 1994).

6        **B.    Sherman Act**

7        Defendants' Counterclaims I-III allege violations of the Sherman Act under 15 U.S.C.

8  § 1 ("Section 1") and 15 U.S.C. § 2 ("Section 2").  The purpose of the Sherman Act is to

9  preserve "free and unfettered competition" in the marketplace.  Northern Pac. Ry. v. United

10  States, 356 U.S. 1, 4 (1958).  The Sherman Act "rests on the premise that the unrestrained

11  interaction of competitive forces will yield the best allocation of our economic resources, the

12  lowest prices, the highest quality and the greatest material progress."  Id.

13        **1.    Section 1 of the Sherman Act (Counterclaim I)**

14        Defendants allege a violation of Section 1 of the Sherman Act, which provides:

15  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of

16  trade or commerce among the several states, or with foreign nations, is declared to be

17  illegal." 15 U.S.C. § 1.  To allege a claim under Section 1, Defendants must allege three

18  elements: "(1) an agreement, conspiracy, or combination among two or more persons or

19  distinct business entities; (2) which is intended to harm or unreasonably restrain competition;

20  and (3) which actually causes injury to competition, beyond the impact on the claimant,

21  within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury')."

22  McGlinchy v. Shell Chem. Co., 845 F.2d 802, 811 (9th Cir. 1988).

23

24

25

26

ORDER  8–

1

### a.    "Contract, Combination . . . or Conspiracy"

2        A Section 1 conspiracy requires "an agreement among two or more persons or distinct

3   business entities."  United States v. Hughes Aircraft Co., 20 F.3d 974, 979 (9th Cir. 1994).

4   "Section 1 of the Sherman Act . . . reaches unreasonable restraints of trade effected by a

5   contract, combination or conspiracy between separate entities.  It does not reach conduct that

6   is wholly unilateral."  Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768

7   (1984).  "Had Congress intended to outlaw unreasonable restraints of trade [effected by a

8   single firm], § 1's requirement of a contract, combination, or conspiracy would be

9   superfluous, as would the entirety of § 2."  Id. at 775.

10       Defendants' Counterclaim I does not mention the words "contract," "combination" or

11  "conspiracy."  See Counterclaims ¶¶ 36-42.  Defendants' Counterclaim I merely alleges that

12  "anti-competitive agreements" and "copyright misuse" form the basis for Plaintiffs' Section 1

13  violation.  Counterclaims ¶¶ 37-39.[7]  Plaintiffs' motion to dismiss argues that the "anti-

14  competitive agreements" and "copyright misuse" do not violate Section 1 of the Sherman Act

15  because there is no "contract," "combination" or "conspiracy."  See Pls.' Mot., docket no.

16  14, at 7-8 and 18.[8]

17       First, Plaintiffs argue that the "anti-competitive agreements" alleged in Defendants'

18  Counterclaim I do not involve an actionable conspiracy because "a conspiracy is not possible

19  _____

20  [7] In a section of Defendants' brief in response to Plaintiffs' motion to dismiss entitled, "The
21  non-compete agreements are not 'wholly unilateral,'" Defendants argue that Plaintiffs
    "acquired competitor businesses as part of an anti-competitive scheme."  Defs.' Resp.,
22  docket no. 18, at 11-12.  Plaintiffs' alleged acquisitions, set forth in Counterclaims ¶ 17, have
    nothing to do with the "non-compete agreements."  Nor have Defendants alleged that
23  Plaintiffs' acquisitions constitute a Section 1 conspiracy between Fiserv/NFS and other
24  companies to carry out anticompetitive goals.

25  [8] Plaintiffs also argue that NFS cannot conspire with Fiserv because NFS is a wholly-owned
    subsidiary of Fiserv.  Pls.' Mot. at 8.  While this is true, see Copperweld, 467 U.S. at 771,
26  Defendants' Counterclaim I does not allege a conspiracy between NFS and Fiserv.  See
    Counterclaims ¶¶ 36-42; Defs.' Resp. at 12.

ORDER   9–

as a matter of law between a corporation and its employees unless those employees have an independent personal stake and a stand to benefit from conspiring to restrain trade." Pls.' Mot. at 8. The general rule is that employees cannot conspire with their employer. Copperweld, 467 U.S. at 769 ("officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy"). However, some circuits have held that there is an exception to this rule if an employee has an "independent personal stake" in the conspiracy to restrain trade. See, e.g., Motive Parts Warehouse v. Facet Enters., 774 F.2d 380, 387 (10th Cir. 1985); H & B Equip. Co. v. Int'l Harvester Co., 577 F.2d 239, 244 (5th Cir. 1978); Greenville Publ'g Co. v. Daily Reflector, Inc., 496 F.2d 391, 399-400 (4th Cir. 1974); but see Nurse Midwifery Assocs. v. Hibbett, 918 F.2d 605, 615 (6th Cir. 1990) (declining to adopt exception). An "independent personal stake" exists when "the employees had interests in economic entities separate from the principal defendant." Int'l Harvester, 577 F.2d at 244. For example, in Motive Parts, where the defendant, an automotive parts supplier, created independent franchises to distribute its products and sold the franchises to its employees, the employees could have an independent stake to conspire with the defendant on behalf of their franchises. See Motive Parts, 774 F.2d at 388. In Greenville, the president of a newspaper company could have an independent stake when he had an interest in another newspaper, and he stood to benefit by pushing the plaintiff competitor out of the market. See Greenville, 496 F.2d at 400.

The Ninth Circuit has never expressly adopted the independent personal stake exception to the general rule that employees cannot conspire with their employer. In the one Ninth Circuit case that referred to the independent personal stake exception, the facts were inconsistent with the exception. See Calculators Hawaii, Inc. v. Brandt, Inc., 724 F.2d 1332, 1336 n.1 (9th Cir. 1983). Even if the Court assumes that this exception applies in the Ninth Circuit, Counterclaim I fails to allege any "independent personal stake." Furthermore, the

1   facts alleged in the Counterclaims do not support an "independent personal stake" under the

2   law of any Circuit.

3        Defendants argue that the Option Agreement gave employees who signed such an

4   agreement an independent personal stake in a conspiracy to restrain trade.  The Option

5   Agreement allowed Pine and Johnston, and other similarly situated employees, to receive

6   stock if they did not violate the non-disclosure and non-solicitation provisions of the

7   agreement.  See Am. Compl., Exs. E-H (Option Agreement) at 2-3, ¶¶ 4(d), 4(e).  The

8   Option Agreement did not, however, give the employees an interest in an economic entity

9   separate from Fiserv/NFS.  See Int'l Harvester Co., 577 F.2d at 244 (no independent

10  personal stake where benefit to employee was "indistinguishable from other forms of

11  compensation, such as salary").  Defendants have cited no case that indicates the risk of an

12  employee losing stock options in its employer's company can create an "independent

13  personal stake" that would give rise to antitrust liability.  Therefore, the general rule that an

14  employee cannot conspire with his or her employer applies to the present case, and the "anti-

15  competitive" agreements alleged in Counterclaim I fail to satisfy the conspiracy element of

16  Section 1 of the Sherman Act.[9]

17       Second, Plaintiffs argue that the "copyright misuse" alleged in Defendants'

18  Counterclaim I does not involve an actionable conspiracy because "Fiserv and NFS cannot

19  conspire with the U.S. Copyright Office" as a matter of law.  Pls.' Mot. at 18.  Defendants

20  failed to respond to Plaintiffs' argument.  Defendants' failure to respond is considered by the

21  Court as an admission that the argument has merit.  See Local Rule CR 7(b)(2).

22  Accordingly, the Court concludes that Defendants have failed to allege a Section 1

23  conspiracy involving Plaintiffs' alleged "copyright misuse."

24

25  _____

26  [9] The Court rejects Defendants' argument under Betz Labs., Inc. v. Desmaretz, 1985 U.S.
    Dist. LEXIS 22830 (N.D. Ill. 1985), that the plurality requirement does not apply to the
    "anti-competitive agreements" in the present case.

ORDER   11–

1

### b.      Conclusion (Counterclaim I)

2      Defendants failed to sufficiently allege the "conspiracy" element of a Section 1

3   Sherman Act claim.[10]  Thus, the Court GRANTED Plaintiffs' motion to dismiss Defendants'

4   Counterclaim I for failure to state a claim upon which relief can be granted.

5

### 2.      Section 2 of the Sherman Act (Counterclaims II and III)

6      Defendants' Counterclaims II and III allege violations of Section 2 of the Sherman

7   Act, which provides, in pertinent part: "Every person who shall monopolize, or attempt to

8   monopolize . . . any part of the trade or commerce among the several States, or with foreign

9   nations, shall be deemed guilty of a felony."  15 U.S.C. § 2.  The Clayton Act makes this

10   provision enforceable by "any person . . . injured in his business or property by reason of

11   anything forbidden in the antitrust laws."  15 U.S.C. § 15.  Counterclaim II alleges

12   "monopolization" under Section 2, whereas Counterclaim III alleges an "attempt to

13   monopolize" under Section 2.

14      To state a "monopolization" claim under Section 2, Defendants must allege three

15   elements: "(1) the possession of monopoly power in the relevant market . . . (2) the willful

16   acquisition or maintenance of that power as distinguished from growth or development as a

17   consequence of a superior product, business acumen, or historic accident," Eastman Kodak

18   Co. v. Image Technical Servs. Inc., 504 U.S. 451, 481-82 (1992) (quoting United States v.

19   Grinnell Corp., 384 U.S. 563, 570-571 (1966)), and (3) antitrust injury.  See Cost Mgmt.

20   Servs., Inc. v. Washington Natural Gas Co., 99 F.3d 937, 949 (9th Cir. 1996); Image

21   Technical Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1202 (9th Cir. 1997); Seattle

22   Totems Hockey Club, Inc. v. National Hockey League, 783 F.2d 1347, 1350 (9th Cir. 1986).

23

24   _____

25   [10] The Court does not decide whether Defendants have sufficiently alleged the other elements
of a Section 1 Sherman Act violation; however, the Defendants' failure to plead "antitrust
injury," as the Court discusses in the context of Defendants' Section 2 Sherman Act claims,

26   would be an alternative ground for the Court's dismissal of Defendants' Section 1 Sherman
Act claim.

ORDER   12–

1   To state an "attempt to monopolize" claim under Section 2, Defendants must allege four

2   elements: "(1) a specific intent to control prices or destroy competition; (2) predatory or

3   anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability

4   of achieving 'monopoly power,' and (4) causal antitrust injury." Image Technical Servs.,

5   125 F.3d at 1202.  The requirements for Section 2 monopolization and attempted

6   monopolization claims "are similar, differing primarily in the requisite intent and the

7   necessary level of monopoly power." Id.  Plaintiffs move to dismiss Defendants' Section 2

8   Counterclaims II and III based on Defendants' failure to sufficiently plead antitrust injury.

9                              **a.   <u>Antitrust Injury</u>**

10          To plead antitrust injury, Defendants must allege that: (1) Plaintiffs' anticompetitive

11   conduct (2) causes injury to competition in a definable market.  See <u>McGlinchy</u>, 845 F.2d at

12   812-13 (The "failure to allege injury to competition is a proper ground for dismissal by

13   judgment on the pleadings."); <u>Rebel Oil Co. v. Atlantic Richfield Co.</u>, 51 F.3d 1421, 1433

14   (9th Cir. 1995) ("To show antitrust injury, a plaintiff must prove that his loss flows from an

15   anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the

16   antitrust laws to award damages for losses stemming from acts that do not hurt

17   competition.").  In other words, "the possession of monopoly power will not be found

18   unlawful unless it is accompanied by an element of anticompetitive *conduct*." <u>Verizon</u>

19   <u>Communications Inc. v. Law Offices of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 407 (2004)

20   (emphasis in original).  And the anticompetitive conduct must be alleged to cause "a decrease

21   in competition in the relevant market." <u>Seattle Totems Hockey Club</u>, 783 F.2d at 1350.  It is

22   insufficient to plead "that the actions harmed [the claimant] in its capacity as a competitor."

23   <u>Id.</u>

24          Defendants have alleged that Plaintiffs have engaged in anticompetitive conduct by:

25   (a) acquiring competitors, Counterclaims ¶ 17; (b) usurping Torrent's intellectual property,

26   <u>id.</u> ¶¶ 19-26, 34; (c) filing repetitive and baseless claims against Torrent to drain its

ORDER   13–

1   resources, id. ¶¶ 27, 35; (d) extracting unreasonable and unenforceable contracts from

2   employees to prevent competition, id. ¶¶ 18, 28-29; and (e) attempting to obtain Torrent's

3   confidential and proprietary development materials.  Id. ¶ 30.  Plaintiffs argue that none of

4   these behaviors constitute anticompetitive conduct, and that Defendants have failed to allege

5   the requisite injury to competition in the relevant marketplace with respect to each of these

6   behaviors.

7        The Court examines each aspect of Plaintiffs' "anti-competitive strategy" to determine

8   whether Defendants have sufficiently alleged "antitrust injury."  The Court requires more

9   than the sweeping legal conclusion that Fiserv/NFS's anticompetitive conduct has caused

10  injury to competition in the relevant market, see Counterclaims ¶¶ 31, 33, 40, 42, 47, 49, 52,

11  56, to overcome Plaintiffs' motion to dismiss for failure to state a claim.  See Les Shockley

12  Racing v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 507-08 (9th Cir. 1989) (noting that "a section

13  one claimant may not merely recite the bare legal conclusion that competition has been

14  restrained unreasonably" but rather "must, at a minimum, sketch the outline of the antitrust

15  violation with allegations of supporting factual detail"); Rutman Wine Co. v. E. & J. Gallo

16  Winery, 829 F.2d 729, 735-36 (9th Cir. 1987) (affirming 12(b)(6) dismissal because

17  complaint merely alleged bare legal conclusions) (quoting Car Carriers v. Ford Motor Co.,

18  745 F.2d 1101, 1108 (7th Cir. 1984)).   To survive a FED. R. CIV. P. 12(b)(6) motion to

19  dismiss, Defendants must "allege sufficient facts from which the court can discern the

20  elements of an injury resulting from an act forbidden by the antitrust laws."  Cost Mgmt.

21  Servs., 99 F.3d at 950.

22                          **i.    Acquiring Competitors**

23       Based upon Defendants' representation that "Torrent does not challenge the

24  acquisitions, standing alone, as antitrust violations," see Defs.' Resp. at 21, the Court does

25  not consider Plaintiffs' acquisitions of competitors, see Counterclaims ¶ 17, as an

26  independent basis for Defendants' Section 2 Counterclaims II and III.

ORDER   14–

1              **ii.      Usurping Torrent's Intellectual Property**

2          Defendants allege that part of Plaintiffs' anticompetitive strategy is Plaintiffs'

3   "attempt to usurp ownership of Torrent's intellectual property," namely the copyright in the

4   "Executive Summary" authored by Pine.  Counterclaims ¶¶ 19-21.  Plaintiffs argue that their

5   registration of a copyright for the "Executive Summary" and their enforcement of the

6   copyright are immune from antitrust liability under the Noerr-Pennington doctrine, see

7   Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961)

8   ("Noerr"), Mine Workers v. Pennington, 381 U.S. 657 (1965) ("Pennington"), and

9   Professional Real Estate Investors, Inc. v. Columbia Pictures, 508 U.S. 49 (1993) ("PRE").

10         The registration of a copyright is a governmental action taken by the United States

11  Copyright Office at the request of a private party.  In Noerr, the United States Supreme Court

12  stated that "it has been held that where a restraint upon trade or monopolization is the result

13  of valid governmental action, as opposed to private action, no violation of the Act can be

14  made out."  Noerr, 365 U.S. at 136.  However, Noerr does not apply where a fraud has been

15  alleged.  See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240,

16  1261 (9th Cir. 1982) ("[T]he fraudulent furnishing of false information to an agency in

17  connection with an adjudicatory proceeding can be the basis for antitrust liability, if the

18  requisite predatory intent is present and the other elements of an antitrust claim are

19  proven.").  For the purposes of this motion, the Court takes Defendants' allegations, as to the

20  fraud committed upon the United States Copyright Office by Plaintiffs, as true.  Thus,

21  Plaintiffs' fraudulent registration of the copyright is not immune from antitrust liability under

22  the Noerr-Pennington doctrine.

23         The issue then is whether Defendants have sufficiently alleged an antitrust injury

24  caused by Plaintiffs' copyright registration of the "Executive Summary."  Defendants allege

25  that Fiserv/NFS has never used the copyrighted work.  Counterclaims ¶ 24.  Furthermore,

26  Defendants allege that Fiserv/NFS's primary purpose in procuring the copyright was to

ORDER   15–

create a basis for a copyright claim against Torrent in this lawsuit and to deny Defendants

their lawful right to register the document. Id. ¶¶ 21, 24. If Plaintiffs have never used the

copyrighted work, it is untenable that the copyright registration could have caused a decrease

in competition in the relevant flood vendor market. Defendants can prove no set of facts

consistent with these allegations that would entitle them to relief under Section 2 of the

Sherman Act. Accordingly, the Court rejects Plaintiffs' copyright registration of the

"Executive Summary" as a basis for Defendants' Section 2 Counterclaims II and III.

The enforcement of the copyrighted "Executive Summary" is part of Plaintiffs'

lawsuit against Defendants. Am. Compl., ¶¶ 78-86 (alleged facts regarding the "Executive

Summary"), 166-178 (Plaintiffs' copyright infringement claim against Defendants). Parties

who petition the government for redress are generally immune from antitrust liability. See

Noerr, 365 U.S. at 135-143; Pennington, 381 U.S. at 669. The Noerr-Pennington doctrine

has been extended to include immunity for parties petitioning the courts. California Motor

Transport Co. v. Trucking Unlimited, 404 U.S. 508, 509-11 (1972). However, if a party is

bringing suit simply as a "sham" to harm its competitors, then the litigation activities can be

considered antitrust activity. See PRE, 508 U.S. at 56-61; California Motor Transport, 404

U.S. at 512. PRE sets up a two-part test for the sham litigation exception to Noerr immunity:

> First, the lawsuit must be objectively baseless in the sense that no reasonable
> litigant could realistically expect success on the merits. If an objective litigant
> could conclude that the suit is reasonably calculated to elicit a favorable
> outcome, the suit is immunized under Noerr, and an antitrust claim premised
> on the sham exception must fail. Only if the challenged litigation is
> objectively meritless may a court examine the litigant's subjective motivation.

PRE, 508 U.S. at 60; see also Liberty Lake Invs., Inc. v. Magnuson, 12 F.3d 155, 157 (9th

Cir. 1993).

As previously mentioned, the Court takes Defendants' allegations, as to the fraud

committed upon the United States Copyright Office by Plaintiffs, as true. Thus, for the

purposes of this motion, Plaintiffs' copyright infringement claim must be considered

ORDER  16–

1   objectively baseless under <u>PRE</u>.  Plaintiffs' enforcement of the allegedly fraudulently-

2   obtained copyright is not immune from antitrust liability under the <u>Noerr-Pennington</u>

3   doctrine.

4          The issue then is whether Defendants have sufficiently alleged an antitrust injury

5   caused by Plaintiffs' copyright infringement action against Defendants.  Defendants allege

6   that Plaintiffs' "attempt to enforce a copyright actually owned by Torrent" is "an effort to

7   prevent Torrent from describing and promoting its business – and to prevent competition in

8   the marketplace generally."  Counterclaims ¶ 19.  Defendants further allege that "Fiserv/NFS

9   is improperly trying to prevent Torrent, and others, from entering the flood insurance vendor

10  market . . . through an aggressive and overreaching attempt to enforce an invalid and

11  improperly-obtained copyright."  <u>Id.</u> ¶ 26.  These allegations do not assert that any injury to

12  competition has occurred, merely that that is the intent of Plaintiffs' action.  Moreover, no

13  set of facts could support an allegation of injury to competition because the "Executive

14  Summary" pertains specifically to Torrent; the "Executive Summary" describes Torrent's

15  business model and Torrent's planned technology.  Counterclaims ¶¶ 19-21; Am. Compl. Ex.

16  N; Answer, docket no. 9, ¶ 80.  Furthermore, Plaintiffs bring their copyright claim against

17  Defendants only, not against any "other" potential competitors of Fiserv/NFS.  Antitrust laws

18  were enacted for "the protection of competition, not competitors."  <u>Brown Shoe Co. v.</u>

19  <u>United States</u>, 370 U.S. 294, 320 (1962); <u>see also</u> <u>McGlinchy</u>, 845 F.2d at 812 ("The

20  elimination of a single competitor, without more, does not prove anticompetitive effect.").

21  Accordingly, the Court rejects Plaintiffs' copyright enforcement action against Defendants as

22  a basis for Defendants' Section 2 Counterclaims II and III.

23                          **iii.      Filing Repetitive and Baseless Claims Against Torrent**

24          Defendants allege that part of Plaintiffs' anticompetitive strategy is Plaintiffs' filing of

25  "repetitive and baseless claims" against Torrent "in an effort to drain Torrent of economic

26  resources."  Counterclaims ¶ 27.  Defendants specifically complain about a lawsuit filed by

ORDER   17–

Plaintiffs in King County Superior Court, about the present lawsuit in federal court, and about Plaintiffs' registration of the copyright for the "Executive Summary." Id. ¶¶ 27, 35. Defendants did not expressly allege that Fiserv/NFS's litigation has been a "sham;" however, the Court resolves any doubts in favor of the pleader and construes Defendants' allegations that Plaintiffs have "filed repetitive and baseless claims" as an allegation of "sham" litigation.

Defendants ask the Court to view the two lawsuits, coupled with Plaintiffs' fraudulent copyright registration, as a whole. Defs.' Resp. at 17. The Court has had the opportunity to become intimately familiar with some of Plaintiffs' claims in the present lawsuit through Defendants' motion for partial summary judgment, docket no. 23, and concludes that the present lawsuit is not "objectively baseless." PRE, 508 U.S. at 60. Accordingly, Plaintiffs' alleged "repetitive and baseless claims" are immune from antitrust liability under the Noerr-Pennington doctrine. Even if Plaintiffs' "repetitive and baseless claims" were not immune, Defendants have failed to allege the requisite antitrust injury caused by Plaintiffs' claims. See Counterclaims ¶¶ 27, 35 (alleging injury only to Defendants, not to competition in the relevant market). For both of these reasons, the Court rejects Plaintiffs' "repetitive and baseless claims" as a basis for Defendants' Section 2 Counterclaims II and III.

> **iv.** **Extracting Unreasonable and Unenforceable Contracts from Employees**

Defendants allege that the Confidentiality Agreement, a non-disclosure agreement, and the Option Agreement, which includes non-solicitation and/or non-compete provisions, are "anti-competitive agreements." Counterclaims ¶¶ 18, 28-29. Plaintiffs argue that non-disclosure agreements do not injure competition as a matter of law. See IDX Systems Corp. v. Epic Systems Corp., 285 F.3d 581, 585 (7th Cir. 2002) (stating non-disclosure agreements "protect intellectual property without affecting competition" and that "[n]othing in the antitrust laws gives one producer a right to sponge off another's intellectual property").

ORDER   18–

1   Defendants basically concede this statement of law. Defs.' Resp. at 9 ("[T]hat nondisclosure

2   agreements are subject to a lower level of antitrust scrutiny . . . is more or less true, as far as

3   it goes"). Defendants thereafter solely refer to the Option Agreement as the basis for their

4   antitrust counterclaims. Thus, the Court rejects the Confidentiality Agreement as a basis for

5   Defendants' Section 2 Counterclaims II and III and focuses on whether Defendants have

6   sufficiently alleged that the Option Agreement has caused an "antitrust injury." Defendants

7   have failed to allege that competition in the relevant market has been injured as a result of

8   the Option Agreement (or "anti-competitive agreements," as the Option Agreement is more

9   generally referred to in the Counterclaims). See Counterclaims ¶¶ 18, 28-29. Accordingly,

10  the Court rejects the "anti-competitive agreements" as a basis for Defendants' Section 2

11  Counterclaims II and III.

12                           v.    **Attempting to Obtain Torrent's Confidential and**

13                                 **Proprietary Development Materials**

14          Defendants allege that part of Plaintiffs' anticompetitive strategy is Plaintiffs'

15  "demand[] that Torrent hand over to Fiserv/NFS all of Torrent's proprietary development

16  materials." Counterclaims ¶ 30. Plaintiffs' motion to dismiss argues that it is not

17  "anticompetitive conduct" for NFS to have made requests to inspect Torrent's alleged

18  "confidential" and "proprietary" information in demand letters prior to the filing of any suit

19  and as part of discovery during the prior state court proceedings. Pls.' Mot. at 20. Plaintiffs

20  argue that Fiserv/NFS's discovery requests and demand letters are immune from antitrust

21  liability under the Noerr-Pennington doctrine. Id. Defendants failed to respond to Plaintiffs'

22  argument. Defendants' failure to respond is considered by the Court as an admission that the

23  argument has merit. See Local Rule CR 7(b)(2). Accordingly, the Court rejects Plaintiffs'

24  requests for information – as part of pre-litigation conduct and, subsequently, as part of

25  discovery – as a basis for Defendants' Section 2 Counterclaims II and III.

26

ORDER   19–

1

**b.** **Conclusion (Counterclaims II and III)**

Defendants failed to sufficiently allege the "antitrust injury" element of their Section 2 "monopolization" and "attempt to monopolize" Sherman Act claims.  Thus, the Court GRANTED Plaintiffs' motion to dismiss Defendants' Counterclaims II and III for failure to state a claim upon which relief can be granted.

**C.** **State Laws (Counterclaim IV)**

Defendants' Counterclaim IV alleges violations of Wisconsin, Montana and Washington antitrust, monopolization, unfair competition, and restraint of trade laws.  To make a claim under any of the asserted state laws, Defendants must plead antitrust injury (i.e., injury to *competition*).  See, e.g., State of Washington v. Black, 100 Wn.2d 793, 802-03 (1984) (recognizing that under RCW 19.86 "acts or practices which are reasonable business practices or which are not injurious to the public are not the kinds of acts sought to be prohibited."); Boeing Co. v. Sierracin Corp., 108 Wn.2d 38, 61 (1987) ("Injury and damages are essential elements of an antitrust action."); Bizzle v. Northern Mont. Health Care, Inc., 1999 Mont. Dist. LEXIS 1136 at * 5 (Aug. 4, 1999) ("to prevail in his claim plaintiff must show defendants intended to harm competition and actually did injure competition"); Conley Publ'g Group Ltd. v. Journal Communications, Inc., 265 Wis. 2d 128, 140 (2003) ("Wisconsin courts have followed federal court interpretations of Sections 1 and 2 of the Sherman Act and have construed Wisconsin antitrust statutes in conformity with these federal court interpretations.").  The state claims fail because Defendants have failed to allege antitrust injury.  Accordingly, the Court GRANTED Plaintiffs' motion to dismiss Defendants' Counterclaim IV for failure to state a claim upon which relief can be granted.

## IV. CONCLUSION

For the reasons outlined above, the Court GRANTED Plaintiffs' Motion to Dismiss Counterclaims I-IV, docket no. 14.  The Court DISMISSED Defendants' Counterclaims I-IV without prejudice.

ORDER   20–

1    IT IS SO ORDERED.

2    DATED this 25th day of May, 2006.

3

4    _____
     Thomas S. Zilly
5    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   21–