1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

NATIONAL FLOOD SERVICES, INC., a
Delaware corporation, and FISERV, INC., a
Wisconsin corporation,

No.  C05-1350Z

Plaintiffs,

ORDER

v.

TORRENT TECHNOLOGIES, INC., a
Delaware corporation, TRAVIS PINE and
SUSANNA PINE, and their marital
community; THERESA N. JOHNSTON and
RALPH JOHNSTON, and their marital
community,

Defendants.

## I.   INTRODUCTION

This matter comes before the Court on Defendants' Motion for Partial Summary

Judgment, docket no. 23.  The Court, having considered the briefs and supporting

declarations in support of, and in opposition to, the motion, and having heard oral argument

on May 5, 2006, now GRANTS IN PART and DENIES IN PART this motion, for the

reasons stated in this Order.

//

//

ORDER   1–

## II.   BACKGROUND

### A.   Parties

National Flood Services, Inc. ("NFS") and Fiserv, Inc. ("Fiserv") bring this lawsuit against two of NFS's former employees, Travis Pine ("Pine") and Theresa N. Johnston ("Johnston"), and against Torrent Technologies, Inc. ("Torrent").  NFS is a Delaware Corporation with its principal place of business in Montana.  Jones Decl., docket no. 34, ¶ 2. NFS services the insurance industry in support of the National Flood Insurance Program ("NFIP").  Id. ¶ 3.  Fiserv is a Wisconsin publicly-traded corporation, with its principal place of business in Wisconsin.  Id. ¶ 2.  Fiserv has a variety of subsidiaries in various businesses ("Fiserv Group Companies").  Id. ¶ 4.  NFS is a wholly-owned subsidiary of Fiserv.  Id. ¶ 3. Pine worked for NFS from September 1, 2001, to January 28, 2005.  Pine Decl., docket no. 25, ¶¶ 2-3.  Pine's title was Vice President - Information Technology.  Id. ¶ 2.  Johnston worked for NFS from January 8, 1990, to April 29, 2005.  Johnston Decl., docket no. 24, ¶¶ 2-3.  Johnston held different positions while at NFS, eventually becoming a Senior Vice President.  Id. ¶ 2.  At all times while Pine and Johnston were employed by NFS, they were residents of Montana.  Id. ¶ 9; Pine Decl. ¶ 9.

Torrent is a start-up company that was founded by Pine and Johnston.  Pine Decl. ¶ 4; Am. Compl., docket no. 7, ¶¶ 4, 6; Answer, docket no. 9, ¶¶ 4, 6.  Torrent was incorporated in Delaware in February 2005.  Pine Decl. ¶ 4.  Torrent's principal place of business is Washington. Am. Compl. ¶ 3; Answer ¶ 3.  Torrent is currently in the process of developing a state-of-the-art policy processing and claims administration system for use by insurance companies that offer flood insurance through the NFIP "Write Your Own" ("WYO") program.  Pine Decl. ¶ 4.  Pine is the Chief Executive Officer ("CEO") of Torrent.  Id. ¶ 1. Pine is currently a Washington resident.  Am. Compl. ¶ 4; Answer ¶ 4.  Johnston is the President and Chief Operating Officer of Torrent.  Johnston Decl. ¶ 1.  Johnston remains a

ORDER  2–

1  resident of Montana and has lived in Montana her entire life, except for a five year period,

2  from 1983-1988, when she lived in Colorado. Id. ¶ 9.

3      **B.    Present Motion**

4      As part of this lawsuit, Plaintiffs bring two breach of contract claims. Claim No. 2 of

5  Plaintiffs' Amended Complaint alleges breach of the Employee Confidential Information and

6  Development Agreement (the "Confidentiality Agreement") by Pine and Johnston. Am.

7  Compl. ¶¶ 103-07. Claim No. 3 of Plaintiffs' Amended Complaint alleges breach of the

8  Non-Qualified Stock Option Agreement (the "Option Agreement") by Pine and Johnston. Id.

9  ¶¶ 108-12. Defendants move the Court to grant summary judgment and dismiss Plaintiffs'

10  Claim Nos. 2 and 3 as a matter of law.[1] Defendants argue that: (1) the Confidentiality

11  Agreement is unenforceable under Montana law; and (2) the Option Agreement is

12  unenforceable under Wisconsin law.

13      **C.    Confidentiality Agreement**

14      The Confidentiality Agreement is a contract between "Fiserv"[2] and the employee who

15  signs the contract. See Pine Decl., Exs. 3 and 4; Johnston Decl., Exs. 3 and 4. Pine signed

16  the Confidentiality Agreement on two separate occasions – first on September 6, 2001, and

17  secondly on January 13, 2003. Pine Decl. ¶¶ 7-8, Exs. 3 and 4, at 2. Pine signed the

18  Confidentiality Agreement in Kalispell, Montana. Id. ¶ 9. Johnston also signed the

19  Confidentiality Agreement on two separate occasions – first on December 5, 2001, and

20  secondly on January 16, 2003. Johnston Decl. ¶¶ 7-8, Exs. 3 and 4, at 2. Like Pine,

21  Johnston signed the Confidentiality Agreement in Kalispell, Montana. Id. ¶ 9.

22

23

24      [1] Defendants also move for summary judgment on Plaintiffs' Claim Nos. 6, 7, 8, 9, 10 and 14, see Defs.' Mot., docket no. 23, at 1, 24, but they provide no facts, argument or legal authority to support their motion as to these claims. Accordingly, the Court summarily DENIES

25  Defendants' motion for summary judgment as to Plaintiffs' Claim Nos. 6, 7, 8, 9, 10 and 14.

26      [2] The Confidentiality Agreement defines "Fiserv" as "Fiserv, Inc. and/or its affiliates," and defines "affiliates" as "any entity owned or controlled, directly or indirectly, by Fiserv, Inc."

ORDER   3–

The Confidentiality Agreement provides, in pertinent part:

In consideration of my employment at Fiserv, Inc. and/or its affiliates ("Fiserv") or my continued employment at will by Fiserv, and the payment to me of the salary or other compensation that I receive during my employment, I agree as follows:

1.  I will not, without Fiserv's prior written permission, disclose to anyone outside of Fiserv or use in any other way, either during or after my employment, any Fiserv confidential information or material, or any information or material received in confidence from third parties by Fiserv. . . .

* * *

4.  I hereby assign to Fiserv my entire right, title, and interest in any idea, invention, design of a useful article (whether the design is ornamental or otherwise), computer program and related documentation, and other work of authorship (collectively, "Developments"), hereafter made or conceived solely or jointly by me, or created wholly or in part by me, whether or not such Developments are patentable, copyrightable, or susceptible to other forms of protection.  These Developments will relate to the actual or anticipated Fiserv business or research and development, and shall include any Development that may be suggested by me or result from any task assigned to me or work performed by me for or on Fiserv's behalf.

The above provisions concerning assignment of Developments apply only while I am employed by Fiserv in an executive, managerial, product or technical planning, technical, research, programming, or engineering capacity (including without limitation, development, product, manufacturing, systems, consulting, support, and field testing). . . .

I acknowledge that the copyright and any other intellectual property right in designs, computer programs, and related documentation, and works of authorship, created within the scope of my employment, directly or indirectly, belong to Fiserv by operation of law.

Pine Decl., Exs. 3 and 4, at 1; Johnston Decl., Exs. 3 and 4, at 1.  For ease of reference, the Court refers to the first sentence of Section 1 of the Confidentiality Agreement as the "Non-disclosure Provision," and Section 4 of the Confidentiality Agreement as the "Assignment Provision."  These are the provisions of the Confidentiality Agreement upon which Defendants have moved for summary judgment.[3]

---

[3] Defendants' motion could be construed as having also moved for summary judgment on the second sentence of Paragraph 1, which Plaintiffs have referred to as the "Return of Property Provision."  See Defs.' Mot., docket no. 23, at 22; Pls.' Resp., docket no. 32, at 23.  However, Defendants concede in their reply brief that the Return of Property Provision "is not

ORDER   4–

1

**D.** **Option Agreement**

The Option Agreement is a contract between Fiserv, Inc. (referred to in the Option

Agreement as the "Company") and the employee who signs it. See Pine Decl., Exs. 1 and 2;

Johnston Decl., Exs. 1 and 2. Pine signed the Option Agreement on two separate occasions –

first on February 11, 2003, and secondly on February 18, 2004. Pine Decl. ¶¶ 5-6, Exs. 1

and 2. Johnston also signed the Option Agreement on two separate occasions – first on

February 11, 2003, and secondly on February 18, 2004. Johnston Decl. ¶¶ 5-6, Exs. 1 and 2.

Under the terms of the Option Agreement, Fiserv, Inc. grants an employee stock options,

and, in exchange, the employee agrees, among other things, to abide a restrictive covenant,

outlined in Section 4(d) of the Option Agreement. Defendants' motion for summary

judgment argues that three of the four provisions of the restrictive covenant – 4(d)(i), 4(d)(ii)

and 4(d)(iv) – are facially overbroad and per se invalid.

Section 4(d) of the Option Agreement provides, in pertinent part:

> Notwithstanding any other provision in this Option Agreement, you agree that
> during the term of your employment with the Company or any Subsidiary, and
> for a period of 12 months thereafter, you will not, directly or indirectly, on
> your behalf or on behalf of any other individual, association or entity, as agent
> or otherwise:
>
> (i) contact any of the clients of any Fiserv Group Company for whom you
> directly performed any services or had any direct business contact for the
> purpose of soliciting business or inducing such client to acquire any product or
> service that at any time during the term of this Agreement is provided or under
> development by any Fiserv Group Company from any entity other than a Fiserv
> Group Company;
>
> (ii) contact any of the clients or prospective clients of any Fiserv Group
> Company whose identity or other client specific information you discovered or
> gained access to as a result of your access to any Fiserv Group Company's
> confidential information for the purpose of soliciting or inducing any of such
> clients or prospective clients to acquire any project or service that at any time
> during the term of this Agreement is provided or under development by any
> Fiserv Group Company from any entity other than a Fiserv Group Company;
>
> * * *

an unreasonable restraint of trade." Defs.' Reply, docket no. 40, at 10 n.7. Accordingly, the
enforceability of this provision is not an issue before the Court.

ORDER  5–

(iv) encourage, induce or entice any employee of any Fiserv Group Company with access to or possession of confidential information of any Fiserv Group Company to leave any Fiserv Group Company's employment.

Pine Decl., Exs. 1 and 2, at 2; Johnston Decl., Exs. 1 and 2, at 2.  Under Section 4(e) of the Option Agreement, "[t]he Company may cancel, rescind, suspend, withhold . . . any unexpired, unpaid or deferred part of the Option at any time . . . if you engage in any of the activities listed in Section 4(d)."  Id. at 2.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact based on the evidence before the court.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue actually exists for a material fact.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### B.  Confidentiality Agreement

Defendants argue that the Confidentiality Agreement is unenforceable under Montana law.  A threshold issue, however, is whether Montana law controls because the Confidentiality Agreement does not contain a choice-of-law provision.  Plaintiffs argue that Washington, not Montana, law should apply.

#### 1.  Choice-of-Law Analysis

"In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state" – in this case, Washington.  Paracor Fin., Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1164 (9th Cir. 1996).

ORDER  6–

1

### a.    <u>Actual Conflict</u>

2         In Washington, the "presumptive local law" applies unless there is "an actual conflict

3    between the laws or interests of Washington and the laws or interests of another state."

4    <u>Seizer v. Sessions</u>, 132 Wn.2d 642, 648-49 (1997); <u>see also</u> <u>Burnside v. Simpson Paper Co.</u>,

5    123 Wn.2d 93, 100-04 (1994).  The parties dispute whether there is an actual conflict

6    between the laws of Washington and Montana with respect to the Non-disclosure Provision

7    of the Confidentiality Agreement.  Washington does not apply its restriction on trade statute,

8    RCW § 19.86.030, to non-disclosure agreements and does not expressly require that

9    restrictive covenants contain either a time or place restriction in order to be considered

10   reasonable.  <u>See</u> <u>Pac. Aerospace & Elect., Inc. v. Taylor</u>, 295 F. Supp.2d 1205, 1211-1217

11   (E.D. Wash. 2003) (applying Washington's restriction of trade statute to non-solicitation

12   clause but *not* to the non-disclosure clause of an employee contract); <u>Perry v. Moran</u>, 109

13   Wn.2d 691, 698 (1987) (outlining three-part test for reasonableness of a covenant).  In

14   contrast, Montana applies its restriction on trade statute, Section 28-2-703, MCA, to non-

15   disclosure agreements.  <u>See</u> <u>State Med. Oxygen and Supply, Inc. v. Am. Med. Oxygen Co.</u>,

16   240 Mont. 70, 73-75 (1989) (holding that a non-disclosure agreement violates Montana's

17   statute prohibiting unreasonable restrictions on trade).  Under Montana law, the

18   reasonableness of such agreements will turn, at least in part, on the existence of either a time

19   or place restriction.  <u>See</u> <u>id.</u> at 74.  Under Washington law, the Non-disclosure Provision

20   would be enforceable, whereas under Montana law, the Non-disclosure Provision would not

21   be enforceable.[4]  An actual conflict exists between the laws of Washington and Montana.

22

23

24

25

26         [4] The application of Montana law to the Non-disclosure Provision of the Confidentiality
Agreement is discussed in Section III.B.2. of this Order.

ORDER   7–

1        **b.       The "Most Significant Relationship" Test**

2        Given the existence of an actual conflict of laws, the Court must determine which

3   state's law to apply.  To resolve choice-of-law questions, Washington courts have adopted

4   the "most significant relationship" test, as described in the Restatement (Second) Conflict of

5   Laws § 188 (1971).  Mulcahy v. Farmers Ins. Co. of Wash., 152 Wn.2d 92, 100 (2004);

6   Burnside, 123 Wn.2d at 100.  "Section 188(2) of the Restatement sets forth five contacts that

7   are to be considered in determining the applicable law: (a) the place of contracting, (b) the

8   place of negotiation of the contract, (c) the place of performance, (d) the location of the

9   subject matter of the contract, and (e) the domicil, residence, nationality, place of

10  incorporation and place of business of the parties."  Fluke Corp. v. Hartford Accident &

11  Indem. Co., 145 Wn.2d 137, 149 (2001).  In applying the "most significant relationship" test,

12  the Court does not "merely count the contacts" between each state.  Pac. Gamble Robinson

13  Co. v. Lapp, 95 Wn.2d 341, 346 (1980); Potlach No. 1 Fed. Credit Union v. Kennedy, 76

14  Wn.2d 806, 810 (1969).  "Rather, these contacts are guidelines indicating where the interests

15  of particular states may touch the transaction."  Pac. Gamble Robinson, 95 Wn.2d at 346.

16  The "contacts are to be evaluated according to their relative importance with respect to the

17  particular issue."  Restatement (Second) Conflict of Laws § 188 (1971).

18      The first "place of contracting" factor is defined as "the place where occurred the last

19  act necessary, under the forum's rules of offer and acceptance, to give the contract binding

20  effect."  Restatement (Second) Conflict of Laws § 188 (1971), comment on Subsection (2).

21  It is undisputed that Pine and Johnston signed the Confidentiality Agreement in Montana in

22  consideration of their continued employment at Montana-based NFS.  Thus, the first "place

23  of contracting" factor favors Montana.

24      The second "the place of negotiation of the contract" factor is defined as the place

25  where the parties conducted the negotiations that preceded the making of the contract.

26  Restatement (Second) Conflict of Laws § 188 (1971), comment on Subsection (2).  There is

ORDER   8–

1   no evidence in the record that any negotiations preceded the making of the Confidentiality

2   Agreement.  Presumably, any negotiations were conducted in Montana, where the parties

3   were living and working.  However, in the absence of any evidence, the second "place of

4   negotiations" factor is deemed neutral.

5       The third "place of performance" factor must be examined as to both parties to the

6   contract.  See Restatement (Second) Conflict of Laws § 188 (1971), comment on Subsection

7   (2). "When both parties are to perform in the state, this state will have so close a relationship

8   to the transaction and the parties that it will often be the state of the applicable law."  Id.

9   However, the place of performance "can bear little weight in the choice of the applicable law

10  when (1) at the time of contracting it is either uncertain or unknown, or when (2)

11  performance by a party is to be divided more or less equally among two or more states with

12  different local law rules on the particular issue."  Id.  Here, NFS performed its obligation to

13  Pine and Johnston in Montana, by employing them at Montana-based NFS.  The place of

14  Pine's and Johnston's performance of their obligations under the contract includes both

15  Montana and Washington because the pertinent provisions of the Confidentiality Agreement

16  apply both during and after their employment at Montana-based NFS and apply in

17  connection with their activities at Washington-based Torrent.  However, at the time of

18  contracting, it was unknown to the parties that the place of performance would include

19  Washington.  The third "place of performance" factor favors Montana because that was the

20  only place of performance known to the parties at the time of contracting.

21      The fourth "location of the subject matter" factor is significant "[w]hen the contract

22  deals with a specific physical thing, such as land or a chattel, or affords protection against a

23  localized risk, such as the dishonesty of an employee in a fixed place of employment."

24  Restatement (Second) Conflict of Laws § 188 (1971), comment on Subsection (2).  Plaintiffs

25  allege Pine has taken a computer belonging to NFS with him to Washington in violation of

26  the Return of Property Provision of the Confidentiality Agreement, which requires an

ORDER   9–

1  employee to return NFS property to NFS upon the employee's termination of employment.

2  Am. Compl. ¶¶ 152-58 (Claim No. 11).  In their response to Defendants' motion for

3  summary judgment, Plaintiffs have failed to provide any evidence that this computer is

4  located in Washington; their citation to the Answer (¶¶ 3, 4, 156) fails to demonstrate its

5  location in Washington.  Even if Defendants admitted that the computer was located in

6  Washington, the computer implicates just one of several provisions of the Confidentiality

7  Agreement sought to be enforced by Plaintiffs.  Furthermore, at the time of contracting, any

8  intellectual or tangible property subject to this agreement would have been primarily located

9  at Montana-based NFS.  The fourth "location of the subject matter" factor has not been well-

10  documented and is deemed insignificant to the choice-of-law analysis in the present case.

11       The fifth "domicil" factor requires that the Court consider the "domicil, residence,

12  nationality, place of incorporation, and place of business of the parties."  Restatement

13  (Second) Conflict of Laws § 188 (1971).  The significance of these places "depends largely

14  upon the issue involved and upon the extent to which they are grouped with other contacts."

15  Restatement (Second) Conflict of Laws § 188 (1971), comment on Subsection (2).

16  Generally, "a corporation's principal place of business is a more important contact than the

17  place of incorporation."  Id.  On the one hand, NFS has its place of business in Montana;

18  Pine and Johnston both lived in Montana while they were employees of NFS; and Johnston

19  remains a resident of Montana.  On the other hand, Torrent has its place of business in

20  Washington; and Pine currently is a Washington resident.[5]  Because the parties do business

21  and reside in both states, the Court could consider the fifth "domicil" factor as neutral.

22  However, the Court concludes that the fifth "domicil" factor favors Montana because at the

23  time of the execution of the Confidentiality Agreement, and for several years thereafter, no

24  party was a resident of Washington or doing business in Washington.  See Pac. Gamble

25

26       [5] Fiserv has its place of business in neither Washington nor Montana.  Thus, Fiserv's place of business has no bearing on the choice-of-law analysis.

ORDER   10–

1    Robinson, 95 Wn.2d at 347 (considering the domicil of the parties "at the time of the

2    execution" of the contract, not at the time of the alleged breach).

3        The five factor test shows that Montana, on balance, has more lasting and significant

4    contacts to the Confidentiality Agreement than Washington.  The Court's analysis does not

5    stop here, however, because the five contacts are to be evaluated "in accord with the general

6    underlying principles set out in section 6(2) of the Restatement."  Restatement (Second)

7    Conflict of Laws § 188 (1971).  The principles under Section 6(2) of the Restatement are:

8    "(a) the needs of the interstate and international systems, (b) the relevant policies of the

9    forum, (c) the relevant policies of other interested states and the relative interests of those

10   states in the determination of the particular issue, (d) the protection of justified expectations,

11   (e) the basic policies underlying the particular field of law, (f) certainty, predictability and

12   uniformity of result, and (g) ease in the determination and application of the law to be

13   applied."  Fluke, 145 Wn.2d at 149.  In light of Section 6(2) of the Restatement, the parties

14   have briefed, and the Court has considered, the policy interests of Montana and Washington

15   and the "justified expectations" of the parties.  See also Pac. Gamble Robinson, 95 Wn.2d at

16   346-49 (considering competing policy interests of the states and the expectations of the

17   parties); Potlach, 76 Wn.2d at 811-14 (same).

18       As previously discussed, there is an actual conflict between the laws of Montana and

19   Washington with respect to the Non-disclosure Provision of the Confidentiality Agreement.

20   While Washington does not consider employee confidentiality and non-disclosure provisions

21   as restraints on trade under RCW 19.86.030, see Pac. Aerospace, 295 F. Supp.2d at 1211-17,

22   Montana treats employee non-disclosure provisions as trade restraints that must comply with

23   Section 28-2-703, MCA.  See State Med. Oxygen, 240 Mont. at 73-75.  Thus, Washington's

24   public policy is more favorable to employers, whereas Montana's public policy is more

25   favorable to employees.  Montana's interest in protecting Johnston, who remains a Montana

26   resident, from unreasonable restraints on trade is clear.  Washington's interest in protecting a

1   Montana-based employer, such as NFS, pursuant to a contract executed in Montana by then-

2   residents of Montana is tenuous, at best.  Accordingly, the policy interests of Montana

3   outweigh the policy interests of Washington.

4        "[T]he expectations of the parties to the contract may significantly tip the scales in

5   favor of one jurisdiction's law being applied over another's."  Mulcahy, 152 Wn.2d at 101

6   (internal citations omitted).  "Generally speaking, it would be unfair and improper to hold a

7   person liable under the local law of one state when he had justifiably molded his conduct to

8   conform to the requirements of another state."  Restatement (Second) Conflicts of Laws § 6,

9   note g (1971).  Pine and Johnston assert that they expected that Montana law would apply.

10  Pine Decl. ¶ 9; Johnston Decl. ¶ 9.  Plaintiffs assert that they expected the Confidentiality

11  Agreement to be governed by the laws of the state in which any breach occurred, and they

12  have submitted a declaration of Fiserv's in-house counsel, who supervised the drafting of the

13  Confidentiality Agreement, as evidence of this expectation.  Sprague Decl., docket no. 36, at

14  ¶¶ 3-5.  Ascertaining the parties' subjective intent as to which law they believed would

15  govern is difficult.  Further, it is unclear whether the undisclosed subjective intent of either

16  party would be admissible evidence on the subject of intent.

17       The key issue here is what could the parties have "reasonably expect[ed] at the time

18  the [contract] was executed."  Pac. Gamble Robinson, 95 Wn.2d at 348; see also Potlach, 76

19  Wn.2d at 813.  At the time of contracting, the only state's laws under which the parties in the

20  present case could have molded their conduct to conform to would have been Montana,

21  because that is the state where they all resided and worked, and where the contract was

22  signed.  There were no contacts with Washington state at the time the Confidentiality

23  Agreement was signed in 2001, or in 2003.  Plaintiffs' argument that the law should follow

24  the breach is undermined by their own allegations that Pine and Johnston breached the

25  Confidentiality Agreement while they were employees of NFS, living and working in

26  Montana (in addition to their allegations of breach of contract that arose after Torrent was

ORDER   12–

1  founded).  The justifiable expectations of the parties show that Montana's interest in the

2  Confidentiality Agreement is more significant than Washington's interest.

3      In conclusion, Montana has the most significant relationship to the Confidentiality

4  Agreement, and, accordingly, Montana law applies to determine its enforceability.

5              **2.    Application of Montana Law**

6      The Court addresses the issue of whether the Non-disclosure and Assignment

7  Provisions of the Confidentiality Agreement violate Section 28-2-703, MCA.  "Section

8  28-2-703, MCA, codifies Montana's public policy regarding contracts that restrain[] the

9  exercise of a lawful profession, trade or business of any kind."  State Med. Oxygen, 240

10 Mont. at 73-74.  This statute provides that "[a]ny contract by which anyone is restrained

11 from exercising a lawful profession, trade, or business of any kind, otherwise than is

12 provided for by 28-2-704 or 28-2-705, is to that extent void."  Mont. Code. Ann. § 28-2-703

13 (2005).  Montana courts apply Section 28-2-703, MCA, to restrictive covenants found within

14 employment contracts.  See Montana Mountain Prods. v. Curl, 327 Mont. 7, 11 (2005); State

15 Med. Oxygen, 240 Mont. at 74; Dobbins, DeGuire & Tucker v. Rutherford, MacDonald &

16 Olson, 218 Mont. 392, 396-97 (1985).

17     "Only restraints on trade that are unreasonable are void" under Section 28-2-703,

18 MCA.  Montana Mountain Prods., 327 Mont. at 10.  "Three things are essential" to "a

19 reasonable and limited covenant restraining trade:" "(1) it must be partial or restricted in its

20 operation in respect either to time or place; (2) it must be on some good consideration; and

21 (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the

22 party in whose favor it is made, and must not be so large in its operation as to interfere with

23 the interests of the public."  Id. (quoting O'Neill v. Ferraro, 182 Mont. 214, 218-19 (1979)).

24 In the present case, Plaintiffs have the burden of showing that the Confidentiality Agreement

25 does not violate Section 28-2-703, MCA.  See Daniels v. Thomas, Dean & Hoskins, Inc., 246

26 Mont. 125, 144 (1990) (placing the burden on the party who is asserting that the contract

ORDER   13–

1    does not violate Section 28-2-703, MCA).  Plaintiffs have not asserted nor proven that the

2    sale of the goodwill of a business or the dissolution of a partnership occurred.  Therefore,

3    neither of the statutory exceptions – Sections 28-2-704 and 28-2-705, MCA – applies, and

4    the reasonableness of the Non-disclosure and Assignment Provisions must be examined to

5    determine whether they are valid.

6         Defendants argue that the Non-disclosure Provision fails the first criterion of the

7    reasonableness test because it is not restricted as to either time or place.  As previously

8    noted, the Non-disclosure Provision prohibits an employee or former employee from

9    "disclos[ing] to anyone outside of Fiserv or use in any other way, *either during or after my*

10   *employment*, any Fiserv confidential information or material, or any information or material

11   received in confidence from third parties by Fiserv."  Pine Decl., Exs. 3 and 4, at 1; Johnston

12   Decl., Exs. 3 and 4, at 1 (emphasis added).  Defendants argue that the Non-disclosure

13   Provision here is analogous to the non-disclosure agreement in State Medical Oxygen, where

14   the employee could not disclose information "at any time or in any manner."  240 Mont. at

15   72.  The non-disclosure agreement in State Medical Oxygen was held to be void as a matter

16   of law because it "did not limit the restrictions as to either time or place and therefore did not

17   meet the first essential criterion" of the reasonableness test.  Id. at 74.

18        Although Plaintiffs' response fails to argue that the Non-disclosure Provision satisfies

19   the first criterion of the reasonableness test, see Pls.' Resp., docket no. 32, at 22-24,

20   Plaintiffs' supplemental briefing argues that a temporal limitation may be implied where the

21   value of confidential information is likely to become dated or subject to eventual release.

22   See Pls.' Memorandum, docket no. 44, at 2-3.  In support of this argument, Plaintiffs rely on

23   a Ninth Circuit case, which held that there was an implied temporal limitation to a non-

24   disclosure agreement regarding confidential information under Pennsylvania law.  See Henry

25   Hope X-Ray Prods., Inc. v. Marron Carrel, Inc., 674 F.2d 1336, 1342 (9th Cir. 1982).  The

26   Court declines to recognize an implied temporal limitation under Montana law because the

ORDER   14–

1   Montana Supreme Court clearly voids non-disclosure agreements that fail to expressly limit

2   the restrictions as to either time or place.  See State Med. Oxygen, 240 Mont. at 74.

3   Accordingly, the Non-disclosure Provision fails to meet the first essential criterion of the

4   reasonableness test and is void as a matter of law.[6]

5        Defendants next argue that the Assignment Provision of the Confidentiality

6   Agreement fails to meet the third criterion of the reasonableness test because its scope goes

7   far beyond fairly protecting Fiserv's interests and interferes with the interests of the public.

8   A threshold issue is whether the Assignment Provision is subject to Section 28-2-703, MCA.

9   Although there is no Montana authority subjecting an assignment provision to Section 28-2-

10  703, MCA, Montana Courts have broadly applied the statute in a variety of employment and

11  other contexts.  See, e.g., Montana Mountain Prods., 327 Mont. at 11 (non-compete

12  covenant within employment contract); Daniels, 246 Mont. at 144 (share purchase

13  agreement); State Med. Oxygen, 240 Mont. at 74 (non-disclosure agreement between

14  employer and employee); Dobbins, 218 Mont. at 396-97 (non-compete covenant within

15  employment contract).  The Court considers the Assignment Provision to be a restrictive

16  covenant found within an employment contract, subject to Section 28-2-703, MCA.  On the

17  merits, the reasonableness of the Assignment Provision can only be determined based on the

18  specific factual circumstances of the case.  Accordingly, the Court declines to hold the

19  Assignment Provision unreasonable on its face and void as a matter of law.

20              **3.      Conclusion Regarding the Confidentiality Agreement**

21       The Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Partial

22  Summary Judgment regarding the Confidentiality Agreement, as follows: (1) the first

23  sentence of Section 1 of the Confidentiality Agreement (the "Non-disclosure Provision") is

24

25  ───────────────

26  [6] Having concluded that the first criterion is not met, the Court does not decide whether
    the Non-disclosure Provision meets the remaining two criteria of the reasonableness test.  See
    State Med. Oxygen, 240 Mont. at 74.

1   void as a matter of law; and (2) factual questions preclude summary judgment as to Section 4

2   of the Confidentiality Agreement (the "Assignment Provision").

3        Montana law provides for the severability of contracts: "Where a contract has several

4   distinct objects of which one at least is lawful and one at least is unlawful, in whole or in

5   part, the contract is void as to the latter and valid as to the rest."  Mont. Code Ann. § 28-2-

6   604 (2005).  Accordingly, the unenforceability of the Non-disclosure Provision does not

7   render the remainder of the Confidentiality Agreement unenforceable.  Plaintiffs' Claim No.

8   2, alleging breach of the Confidentiality Agreement, is dismissed only to the extent Claim

9   No. 2 was premised upon the allegation of Defendants' breach of the Non-disclosure

10  Provision.

11       **C.     <u>Option Agreement</u>**

12       The Option Agreement is governed by Wisconsin law.  Section 9(f) of the Option

13  Agreement states that: "This Agreement shall be governed by and construed in accordance

14  with the laws of the State of Wisconsin, without regard to conflict of law provisions."  Pine

15  Decl., Exs. 1 and 2, at 6; Johnston Decl., Exs. 1 and 2, at 6.

16       Defendants argue that Sections 4(d)(i), 4(d)(ii) and 4(d)(iv) of the Option Agreement

17  are per se invalid under Wisconsin law.  Generally, Wisconsin law "seeks to encourage the

18  mobility of workers" and to further this purpose Wisconsin courts "have applied the

19  following canons of construction to covenants not to compete: (1) such covenants are prima

20  facie suspect; (2) they must withstand close scrutiny to pass legal muster as being reasonable;

21  (3) they will not be construed to extend beyond their proper import or further than the

22  language of the contract absolutely requires; and (4) they are to be construed in favor of the

23  employee."  <u>Farm Credit Servs. of N. Cent. Wis. v. Wysocki</u>, 243 Wis.2d 305, 312-13

24  (2001).  "These canons are grounded in Wis. Stat. § 103.465."  <u>Id.</u> at 313.  This statute

25  provides:

26

ORDER   16–

> A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this subsection, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

Wis. Stat. § 103.465 (2002). "Case law has distilled the following five requirements from the statute: 'The covenant must (1) be necessary for the protection of the employer; (2) provide a reasonable time restriction; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive as to the employee; and (5) not be contrary to public policy.'" NBZ, Inc. v. Pilarski, 185 Wis.2d 827, 840 n.6 (Wis. Ct. App. 1994) (quoting Fields Found., Ltd. v. Christensen, 103 Wis.2d 465, 470 (Wis. Ct. App. 1981)); see also Heyde Cos. v. Dove Healthcare, LLC, 258 Wis.2d 28, 38 (2002).

The Court will apply this five-part reasonableness test to determine whether Sections 4(d)(i), 4(d)(ii) and 4(d)(iv) violate Wis. Stat. § 103.465.[7]  Under Wisconsin law, "[a]ny part of an indivisible covenant, even if reasonable on its own, will not be given effect if any other part is unreasonable." Mut. Serv. Cas. Ins. Co. v. Brass, 242 Wis.2d 733, 742 (Wis. Ct. App. 2001).  If different provisions "come into play in totally different fact situations . . . the restraints are divisible;" conversely, the restraints are indivisible if they "govern[] several similar types of activities and establish[] several time and geographical restraints." Streiff v. Am. Family Mut. Ins. Co., 118 Wis.2d 602, 613 (1984).  If different provisions make an employee subject to the same penalty if he violates any provision, that is also evidence that

---

[7] The Court rejects Plaintiffs' threshold argument that Pine and Johnston "affirmed" the contract by exercising the stock options and that, as a result, the Court need not reach the issue of whether Section 4(d) violates Wis. Stat. § 103.465.  Wis. Stat. § 103.465 indisputably is a statute intended to protect employees, not employers.  The cases relied upon by Plaintiffs are inapplicable to the present case because the party protected by the statute (here, Pine or Johnston) is not the party seeking to enforce the contract.  See Baierl v. McTaggart, 245 Wis.2d 632, 643 (2001); Dawson v. Goldammer, 259 Wis.2d 664, 670-74 (Wis. Ct. App. 2002).

ORDER   17–

1   the provisions are part of an indivisible covenant.  Id. at 612.  The Court concludes, as the

2   Mutual Service Casualty and Streiff courts did, that the provisions at issue – Sections 4(d)(i),

3   4(d)(ii), 4(d)(iii)[8] and 4(d)(iv) – are intertwined and indivisible because they govern several

4   similar types of activities and establish several time and geographical restraints.  Under

5   Section 4(e) of the Option Agreement, the same penalty is imposed for a violation of any of

6   these provisions.  Therefore, if one provision is unreasonable, all of the provisions are

7   unreasonable.

8            **1.        Section 4(d)(i) of the Option Agreement**

9            Under Section 4(d)(i) of the Option Agreement, an employee agrees that, "during the

10  term of [his or her] employment . . . and for a period of 12 months thereafter," he or she will

11  not:

12

13      (i) contact any of the clients of any Fiserv Group Company for whom [he or
        she] directly performed any services or had any direct business contact for the
        purpose of soliciting business or inducing such client to acquire any product or
14      service that at any time during the term of this Agreement is provided or under
        development by any Fiserv Group Company from any entity other than a Fiserv
15      Group Company.

16  Pine Decl., Exs. 1 and 2, at 2; Johnston Decl., Exs. 1 and 2, at 2.  Defendants argue that

17  Section 4(d)(i) of the Option Agreement is per se invalid on three grounds.

18           First, Defendants argue that the client list is overbroad because it encompasses clients

19  serviced or contacted throughout an employee's term of employment.  The Supreme Court of

20  Wisconsin has interpreted the "within a specified territory" language in Wis. Stat. § 103.465

21  to "encompass[] customer lists as well as geographical restrictions."  Farm Credit Servs., 243

22  Wis.2d at 315; Rollins Burdick Hunter of Wisconsin, Inc. v. Hamilton, 101 Wis.2d 460, 466

23  (1981) ("[A] limitation expressed in terms of a particular group of forbidden customers or

24  clients is in the manner of a territorial limitation.").  Thus, the absence of a geographic

25  _____

26      [8] Even though Defendants did not move for summary judgment as to the enforceability
    of Section 4(d)(iii), Section 4(d)(iii) is part of the indivisible covenant of Section 4(d) and will
    be rendered unenforceable if any of the challenged sections are unenforceable.

    ORDER   18–

1  restriction in Section 4(d)(i) is "not necessarily fatal." Rollins Burdick Hunter, 101 Wis.2d

2  at 466. The "customer list" restriction, however, must be "narrowly tailored" to protect

3  legitimate interests of the employer. Equity Enters., Inc. v. Milosch, 247 Wis.2d 172, 186

4  n.4 (Wis. Ct. App. 2001); see also Farm Credit Servs., 243 Wis.2d at 308, 315.

5       The Supreme Court of Wisconsin approved a customer list that was limited to

6  customers serviced during a period which was the lesser of two years or the employee's

7  period of employment, see Rollins Burdick Hunter, 101 Wis.2d at 463, and upheld as

8  reasonable a customer list that was limited to customers serviced "at any time during the one

9  year immediately prior to the date of separation." Farm Credit Servs., 243 Wis.2d at 310,

10 315. In light of these cases, the Wisconsin Court of Appeals held that a customer list

11 restriction that prohibited an employee from doing business with any customer "serviced . . .

12 during any part of Employee's employment" was overbroad, not "narrowly tailored," and

13 unreasonable. Equity Enters., 247 Wis.2d at 178, 186. Equity Enterprises reasoned that the

14 restriction would unreasonably prohibit the employee, who left his job in 1997, from doing

15 business with a customer he serviced during his first weeks of employment in 1982. Id. at

16 186.

17      Section 4(d)(i) is analogous to the covenant in Equity Enterprises because the client

18 list is not limited by a pre-termination time limit. For Pine, who worked at NFS from

19 September 1, 2001, to January 28, 2005, the client list would potentially encompass any

20 clients serviced or contacted during his over three years of employment at NFS. For

21 Johnston, who worked at NFS from January 8, 1990, to April 29, 2005, the client list would

22 potentially encompass any clients serviced or contacted during her over fifteen years of

23 employment at NFS. Plaintiffs make a vague assertion in a footnote that because "Fiserv did

24 not even acquire NFS until September 29, 2000," "the clients for whom Johnston and Pine

25 'directly performed services or had direct business contact' were not 'Fiserv Group

26 Company' clients until after Fiserv's acquisition of NFS." Pls.' Resp., docket no. 32, at 11

ORDER  19–

n.9.  It is unclear whether Plaintiffs are asserting that Section 4(d)(i) only encompasses new clients serviced or contacted after September 29, 2000.  Any NFS client contacted prior to that date who continued on as a NFS client after that date would appear to be covered by Section 4(d)(i).  The ambiguity raised here emphasizes the importance of the requirement for a covenant to "provide a reasonable territorial limit" using a "narrowly tailored" customer list, and the Court does not read one into the contract where one is not expressly provided.

Plaintiffs argue that Wisconsin law does not require a "look back" time restriction in order for a customer list-based restrictive covenant to be facially valid, and, in support of their argument, they rely on Chuck Wagon Catering, Inc. v. Raduege, 88 Wis.2d 740, 745 (1978).  Chuck Wagon involved a lunch truck salesman who sold food to customers at the same twenty-six to twenty-nine stops along a fixed route every day for two and one-half years.  88 Wis.2d at 752.  The Supreme Court of Wisconsin upheld a one-year post-termination restriction that required the salesman to refrain from engaging in the business of catering to customers on the lunch route that he had been leasing.  Id. at 745.  The Court recognizes that Chuck Wagon did not contain a "look back" time restriction, but distinguishes the present case based on the fact that it is not a "fixed route" case.  The clients with whom Pine and Johnston are prohibited from contacting under Section 4(d)(i) are not necessarily clients with whom they have had any frequency of contact akin to the fixed route salesman in Chuck Wagon, who had daily contact with the same customers.  Furthermore, Chuck Wagon does not help Plaintiffs because it predates Farm Credit Services, Rollins Burdick Hunter, and Equity Enterprises, in which the doctrine of "narrowly tailored customer lists" was developed.  While it is true that there is no per se rule requiring a pre-termination time limit, such a limit, when viewed in the totality of the circumstances, can significantly tip the scales toward a holding that a client list is "narrowly tailored" as a matter of law.

ORDER  20–

1    Because the client list in Section 4(d)(i) has no pre-termination time limit and is not

2    otherwise narrowly tailored, Section 4(d)(i) violates Wis. Stat. § 103.465.  Under the rule

3    that if one provision is unreasonable, all of the provisions of an indivisible covenant are

4    unreasonable, Section 4(d), in its entirety, is unenforceable.

5    The Court's analysis of the enforceability of Section 4(d) could stop here.  However,

6    to provide guidance for the future, the Court evaluates Defendants' alternative arguments for

7    summary judgment.  In addition to raising the pre-termination time limit issue, Defendants

8    also challenge Section 4(d)(i) on the basis that the definition of "customer" is unduly

9    expansive.  Defendants note that Section 4(d)(i) includes not only customers for whom the

10   employee has "directly performed any services" but also includes any customer with whom

11   the employee has had any "direct business contact."  Defendants' argument that the "direct

12   business contact" phrase is broader than the phrases used in other cases is not persuasive.

13   See Equity Enters., 247 Wis.2d at 179 (customers with whom employee has "transacted

14   business . . . or serviced"); Farm Credit Servs., 243 Wis.2d at 314 (customers that the

15   employee "consulted or serviced").  Furthermore, Defendants have provided no authority

16   requiring that "direct business contact" be defined in the contract.  Lastly, the Court notes

17   that the Supreme Court of Wisconsin declined to adopt a per se rule invalidating all

18   restrictive covenants whose scope exceeded a former employee's actual customer contact; in

19   other words, the Court held open the possibility that *no contact* between an employee and a

20   client would be required for a covenant to be considered reasonable under some

21   circumstances.  See Rollins Burdick Hunter, 101 Wis.2d at 462-63, 468; but see Mut. Serv.

22   Cas. Ins. Co. v. Brass, 242 Wis.2d at 743 (holding geographical limitation to be overbroad in

23   provisions prohibiting the solicitation of "any MSI policyholders").[9]  Accordingly, the Court

24

25   _____

26   [9] It is noteworthy that the covenant in Rollins Burdick Hunter, unlike Section 4(d)(i) in
     the present case and unlike the provisions in Mutual Service Casualty, did contain a pre-
     termination time limit.

ORDER   21–

1  concludes that Section 4(d)(i) is not per se invalid due to its "direct business contact"

2  language.

3      Defendants third challenge to Section 4(d)(i) focuses on the "purpose" aspect of

4  Section 4(d)(i).  Section 4(d)(i) prohibits client contact for the purpose of competing with

5  Fiserv regarding "any product or service" that "is provided or under development by any

6  Fiserv Group Company."  Defendants argue that, for example, Pine would be prohibited

7  from attempting to do business with a Fiserv customer regarding a product or service that he

8  had never sold or worked on, and had no knowledge of, during his employment at NFS, but

9  which product or service was offered or under development by one or the more than 100

10  other Fiserv companies.  While the Court acknowledges the potentially sweeping breadth of

11  this "purpose" statement, the Court concludes that on the meager factual record before the

12  Court, it is not possible to determine the reasonableness of the "purpose" statement.  In

13  contrast to the question of whether a client list is narrowly tailored by a pre-termination time

14  limit, which the Court can readily determine on the factual record before it, the question of

15  whether the purpose statement is reasonable cannot be readily determined without a further

16  development of the evidentiary record.  See Rollins Burdick Hunter, 101 Wis.2d at 470-72.

17  Accordingly, the Court concludes that Section 4(d)(i) is not per se invalid due to its purpose

18  statement.

19          **2.      Section 4(d)(ii) of the Option Agreement**

20      Under Section 4(d)(ii) of the Option Agreement, an employee agrees that, "during the

21  term of [his or her] employment . . . and for a period of 12 months thereafter," he or she will

22  not:

23

24      (ii) contact any of the clients or prospective clients of any Fiserv Group
         Company whose identity or other client specific information [he or she]
         discovered or gained access to as a result of [his or her] access to any Fiserv

25      Group Company's confidential information for the purpose of soliciting or
         inducing any of such clients or prospective clients to acquire any project or

26      service that at any time during the term of this Agreement is provided or under

ORDER   22–

1   development by any Fiserv Group Company from any entity other than a Fiserv

2   Group Company.

3   Pine Decl., Exs. 1 and 2, at 2; Johnston Decl., Exs. 1 and 2, at 2.  Defendants argue that

4   Section 4(d)(ii) of the Option Agreement is per se invalid because the client list is not

5   narrowly tailored to protect the legitimate interests of NFS/Fiserv.[10]  Under the "customer-

6   contact theory," an employer is deemed to have a legitimate interest in restricting an

7   employee's access to customers after the term of employment "if the employee had such

8   control or influence over the customers that the employee would be able to take the

9   customers away from the employer."  Wausau Med. Ctr. v. Asplund, 182 Wis.2d 274, 288

10  (Wis. Ct. App. 1994) (citing Lakeside Oil Co. v. Slutsky, 8 Wis.2d 157, 163 (1959)).

11          Even if the Court assumes, as Plaintiffs assert, that Pine and Johnston had access to

12  confidential information of not only NFS but also other Fiserv Group Companies, the client

13  list in Section 4(d)(ii) is not narrowly tailored.  No development of the factual record could

14  cure the overbreadth of Section 4(d)(ii)'s client list.  First, Section 4(d)(ii) not only restricts

15  Pine and Johnston's access to their employer's clients, but also restricts their access to

16  *prospective* clients.  Plaintiffs have failed to provide any legal authority supporting such an

17  expansive interpretation of the customer-contact theory.  The Court holds as a matter of law

18  that an employer does not have a legitimate interest in preventing an employee from

19  contacting an entity that has never been a client of the employer.  Second, Section 4(d)(ii)'s

20  client list is not narrowly tailored because it applies to clients and prospective clients of any

21  Fiserv Group Company and is not limited to clients of Pine and Johnston's employer, namely

22  NFS.  Third, Section 4(d)(ii) is not narrowly tailored because it prohibits contact with clients

23  and prospective clients whose identity or client specific information was learned from access

24

25  ──────────────

26          [10] Defendants also argue that the "purpose" statement is overbroad.  As stated with regard
    to Section 4(d)(i), the question of whether the purpose statement is reasonable cannot be readily
    determined without a further development of the evidentiary record.

ORDER   23–

1   to confidential information even if the identity or client specific information is publicly

2   known.  For these reasons, the Court holds Section 4(d)(ii) per se invalid as a matter of law.

3   **3.   Section 4(d)(iv) of the Option Agreement**

4   Under Section 4(d)(iv) of the Option Agreement, an employee agrees that, "during the

5   term of [his or her] employment . . . and for a period of 12 months thereafter," he or she will

6   not:

7   (iv) encourage, induce or entice any employee of any Fiserv Group Company
    with access to or possession of confidential information of any Fiserv Group

8   Company to leave any Fiserv Group Company's employment.

9   Pine Decl., Exs. 1 and 2, at 2; Johnston Decl., Exs. 1 and 2, at 2.  Defendants argue that

10  Section 4(d)(iv) of the Option Agreement is per se invalid because it prohibits Pine and

11  Johnston from hiring any of the 22,000 Fiserv Group employees who have access to

12  undefined confidential information and because it prohibits Pine and Johnston from

13  encouraging any Fiserv employee to leave his or her employment with Fiserv for any purpose

14  whatsoever.

15  Based on the plain language of Section 4(d)(iv), the Court does not consider Section

16  4(d)(iv) to be a no-hire provision.  Thus, the no-hire case on which Defendants rely is

17  inapplicable.  See Heyde Cos., 258 Wis.2d 28 (2002) (holding a no-hire provision

18  unenforceable because it restricts the employment opportunities of employees without their

19  knowledge and consent and constitutes an unreasonable restraint of trade, in violation of

20  Wis. Stat. § 103.465).  The plain language of Section 4(d)(iv), in contrast to the language in

21  Heyde, does not prohibit Pine and Johnston from hiring any Fiserv Group Company

22  employee who applies for a position with them.  Contrary to Defendants' assertion, Section

23  4(d)(iv) does not restrict the employment opportunities of any Fiserv employee.

24  The next question is whether Wis. Stat. § 103.465 even applies to Section 4(d)(iv).

25  Plaintiffs argue that it does not apply because Section 4(d)(iv) is neither a non-compete nor a

26  no-hire provision.  In applying Wis. Stat. § 103.465 to a no-hire provision in an agreement

ORDER   24–

1    between employers, as opposed to between an employer and an employee, the Supreme

2    Court of Wisconsin in <u>Heyde</u> explained that Wis. Stat. § 103.465 applies to any "covenants

3    that impose unreasonable restraints on employees" regardless of the label attached to the

4    restriction.  <u>See</u> <u>Heyde</u>, 258 Wis.2d at 36.  Given the disregard for semantics and the

5    application of the statute to any restraint on employees, the Court applies Wis. Stat.

6    § 103.465 to Section 4(d)(iv).  On the merits, however, Defendants have failed to provide

7    any legal authority supporting their argument that Section 4(d)(iv) is per se invalid because it

8    prohibits Pine and Johnston from encouraging certain Fiserv Group Company employees to

9    leave any Fiserv Group Company's employment.  Accordingly, the Court declines to hold

10   Section 4(d)(iv) per se invalid as a matter of law.

11   **4.      Conclusion Regarding the Option Agreement**

12           The Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Partial

13   Summary Judgment regarding the Option Agreement, as follows: (1) the client list in Section

14   4(d)(i) is not narrowly tailored and therefore Section 4(d)(i) violates Wis. Stat. § 103.465; (2)

15   the client list in Section 4(d)(ii) is not narrowly tailored and therefore Section 4(d)(ii)

16   violates Wis. Stat. § 103.465; and (3) Section 4(d)(iv) is not per se invalid.  Sections 4(d)(i)

17   and 4(d)(ii) are unreasonable and unenforceable.  Under the rule that if one provision of an

18   indivisible covenant is unreasonable, all of the provisions are unreasonable, Section 4(d), in

19   its entirety, is unreasonable and unenforceable.

20   **IV.   CONCLUSION**

21           The Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Partial

22   Summary Judgment, docket no. 23, as outlined below:

23           (1)     The Court GRANTS IN PART and DENIES IN PART Defendants' motion as

24   to Claim No. 2.  The Court DISMISSES Plaintiffs' Claim No. 2 with prejudice, but only to

25   the extent that the claim is premised upon the allegation of Defendants' breach of the first

26

ORDER   25–

1  sentence of Section 1 of the Confidentiality Agreement (the "Non-disclosure Provision").

2  Plaintiffs' Claim No. 2 as to any other provisions of the Confidentiality Agreement remain.

3     (2)   The Court GRANTS Defendants' motion as to Claim No. 3.  The Court

4  DISMISSES Plaintiffs' Claim No. 3 with prejudice.

5     (3)   The Court DENIES Defendants' motion as to Claim Nos. 6, 7, 8, 9, 10 and 14.

6     IT IS SO ORDERED.

7     DATED this 13th day of June, 2006.

8

9

10    Thomas S. Zilly
      United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   26–